Good morning, Your Honors. May it please the Court, my name is John Doran, and I'm appearing on behalf of the appellant. It's my hope that I'll leave about five minutes' worth of rebuttal time, but you never know. But keep in mind that that shows the entire time you have, so when it's down to five minutes, that's your rebuttal time. Thank you, Your Honor. All right. My goal this morning is to discuss three different topics. Hopefully, first, discuss generally the nature of the case and how that affects what the union has claimed is the presumption of arbitration in this case. And second, to discuss specifically the retiree's status, if at all, under the arbitration clause. And third, to discuss the grievance procedure as it applies to the creep issue itself. Your Honors, let me start first with the nature of this case, because I think this case is very atypical in the benefits setting. This Court is not forced, unlike most cases, to have litigation on the one hand and arbitration on the other hand. This Court is faced with the choice of two separate methods of alternative dispute resolution. That is to say, the internal grievance procedure of the plan or the arbitration mechanism of the plan. That does make this case remarkably different from most of the arbitration cases. Well, what happens after the grievance is resolved in some way that doesn't suit the claimant? Then what? ERISA would provide a speedy remedy under 29 U.S.C. Section 1001, Your Honor. That's no different, by the way, from what would happen if they lost an arbitration. You would have a right to appeal from the arbitration. So I'm just wondering why this case is so different. It looks to me like the same as an ordinary. Well, no, no. It is unique in that you're actually talking about two ADR methods that, like all ADR methods, eventually end up in court one way or the other if the parties don't agree. But the question here — Do you think it's different because there's another — there's another administrative step to go to before you get to court on the other side? Well, I believe it's a speedier administrative step, Your Honor. For example, if you look at the grievance procedure as opposed to the arbitration procedure, the grievance procedure has very strict deadlines. It has a 90-day rule, a 60-day rule. The grievance procedure has to move rapidly. If that's the case, then if the retirees don't like the result, they immediately get their day in court under 29 U.S.C. section 1001. Counsel, as a practical matter, with those strict timelines, then if we ruled in your favor in this case, wouldn't the retirees be out of luck because there's no way they can comply with those grievance deadlines at this point? Actually, no, Your Honor. And the reason for that is the union tried to exhaust every possible method of raising this claim. They first filed a grievance under the collective bargaining agreement. They then simultaneously initiated the grievance procedure in this case as well as the arbitration proceeding in this case. So the grievances were made. They have since been denied. Okay. But nonetheless, they are not completely forced out of their rights under the plan because they did exercise their grievance rights. Well, they grieved the collective bargaining issues. They also filed the internal grievance under the plan, Your Honor. Okay. And that's the point I need to make clear here, and that's what makes this case decidedly different. If you read the last two pages of the retiree's brief, it is striking in its candor. It tells the Court, we are result shopping. We didn't like the result we got with the grievance procedure. We now want arbitration. And we now like arbitration better than we liked grievances before because even though they're part of the same SPD, even though they're part of the same PDBA, now we know if we go to arbitration, it will be harder to overturn than the grievance procedures ruling on the internal grievances. I think your argument is an interesting one, that this is employee beneficial ADR. But the real question before us, I think, is whether or not these retirees have a right to arbitration, because if they do, they have a right to choose that even though you have a better, speedier program that you would prefer them to be involved in. I agree wholeheartedly, Your Honor. That is correct. That is the ultimate question. But I think that ultimate question presupposes some things, particularly the most important issue that the union hangs its hat on, and that is the presumption of arbitrability. And if I can turn to the presumption of arbitrability. I assume you're telling me all that background because you think it affects the decision on the presumption of arbitrability. Precisely, Your Honor. And this is why. I have yet to find a case, and the retirees have not cited a case, that says that the presumption of arbitrability should automatically kick in and outweigh all but very clear, unequivocal plan language when you're comparing two separate alternative means of dispute resolution. The policies underlying the presumption don't obtain when you're talking about two alternative methods of dispute resolution. More to the point. In what case are you relying upon to make that argument that the presumption does not apply when you're looking at alternative methods of dispute resolution? Your Honor, I have sought high and low for a case either way. So there is no case of either ways. I believe we are tabula rasa, Your Honor. Nonetheless, there are some other didactic tools here that will get us to that result. For example, the plan in Section 11.3 gives a very broad grant of authority to the plan itself with respect to interpreting the plan and determining eligibility. It is that broad grant of authority that suggests, in the face of a very narrow arbitration provision, that you don't have a presumption of arbitration here, particularly when the alternative is not litigation automatically but an internal grievance. Well, counsel, I admit this is a close question, but it strikes me that the burden that you have is the courts indicate that we can't move away from arbitration unless there's a positive assurance that the dispute cannot go to arbitration. The Supreme Court has been very difficult to make us get away from arbitration. And so it isn't just choices. It seems to me your burden has to be that to show us there's a positive assurance that the dispute is not manageable and should not go to arbitration. Your Honor, I would respectfully disagree because that presupposes that the presumption applies in this case. Okay. And that is the language from AT&T, for example, the Supreme Court case. All right. That's fair. So what you're saying is that the trilogy doesn't apply to this case at all? I would say it does not apply to this case at all, but even if it does, I'll demonstrate in a few minutes why there is clear and unequivocal language. Okay. I'm willing to listen to that. But the AT&T case starts with four primary principles with respect to arbitration. And the very first principle enunciated by the Supreme Court citing to steel workers is the recognition that arbitration is still a matter of contract and courts should not force parties into arbitration if they did not agree to arbitration. And even if there were a presumption then, I think you would ask why is the presumption in place here? It's supposedly in place because of the collective bargaining setting. But this isn't a collective bargaining setting. The agreement that the retirees seek to enforce is a pension and disability benefits agreement. It is an ERISA plan. ERISA has a different policy, I would say, and that's why this case is unique. The shoe is for once on the other foot. Most of the cases that we read are retirees trying to skip arbitration. That's why you see the presumption of arbitration ordinarily. These retirees don't want to skip arbitration because they already lost two grievances, one under the collective bargaining agreement and the second under this plan. When you take into account the fact that the public policy of ERISA is a quick and speedy remedy in a trial court, I think the presumption of arbitration sort of evaporates. But were that not so, even if we were to presume that arbitration should apply but for clear and unambiguous language, we turn to whether or not these particular retirees have standing to seek arbitration. I think the union hangs its hat extensively on the Burke case, and I can't pronounce it. It's B-E-R-G-T from this court. The Burke case, unfortunately, I think the consequence of that case is what I call trolling for ambiguities. Burke said as long as there's an ambiguity with respect to an entitlement to a benefit, whichever document favors the retiree should be in control. So retirees have had a tendency since Burke, and even before Burke, to search high and low for every tiny, little, minute ambiguity within a plan or a contradiction between the plan and the SPD. Courts have had that sort of motive as well at times, and I think this is one of those cases where if you read the U.S. Magistrate Judge's recommendations and Judge Burry's order, they both seek high and low to find some sort of contradiction or some sort of ambiguity. With respect to the retiree's standing, there is no such ambiguity in this case. The plan starts with a definition of employee. That definition is clear and unambiguous. It says an employee is somebody who is working and is a member of the bargaining unit. The plan establishes the arbitration duty. That arbitration duty, according to the plan, is open to employees as defined by the plan. So the PDBA... Suppose they define them by the PDBA? The PDBA incorporates in its entirety the definitions from the plan, as it probably has to. And the point there is the plan specifies a difference between an employee and a terminated employee or a pension. And you don't even have to get to common rules of construction to understand that if they define all three differently, they mean them as different things. So when the PDBA says arbitration in this rare circumstance is open only to employees, it means employees, not terminated employees, not retirees or pensioners. You know, but that's an... The argument can be made the other way. Employees means all the categories of employees. And see, they've defined some other categories of employees. Because they use... You know, this is a problem when you have a definition that includes the same word in the definition. I guess I respectfully disagree, Your Honor. They use employees as capitalized. And other people, they use the term pensioner when they want to. So when we give meaning to all the words in the PDBA as a whole, and when we recognize the doctrine of exclusio unius, then we have to recognize that its reference to the word employee is a term of art as specifically borrowed from the plan. And that term of art means somebody who, under the plan, is in the bargaining unit and is currently employed. So, counsel, as a practical matter, if employee means someone who's currently working, then any pensioner who wanted to challenge the pension could only do so while he was an employee of the company? There's a reason for that, Your Honor. Particularly in the mining industry, this is an early retirement benefit. The employee wants to know before he or she seeks early retirement what their benefit is going to be. Or, if an employee has been on layoff and the employee comes back, the employee has a right to know what his or her benefit status is. Therefore, they go to the plan and say, what is my benefit status? And the plan says, sorry, you don't qualify for the 70-80 benefit. If you take early retirement, you're only going to qualify for this other benefit. And that happens all the time. The reason you would have collective bargaining just or have arbitration just for the question of years of continuous service and just for the question of age is because they are currently employees. Those current employees enjoy a collective bargaining relationship with the union, which has an obligation to arbitrate on their behalf with the employer. So if I decide to retire, I go and talk to your people and they tell me what they want to tell me. I retire and I open up my check and I say, check my envelope. I say, this is not at all what we agreed to. They have no right under your analysis to go to arbitration. That is correct. They would go to the speedier remedy of the internal grievance procedure rather than having to try to figure out what the Federal Mediation and Conciliation Service is and where they are. The company has already made a decision by their people, but they lose their right to arbitrate this very important issue. That is, how much money do I get to live on? They lose the right if they don't ask before they take voluntary early retirement. He asked before. He's told he's going to get the 70-80. Then he opens up his check and he says, it's not included. Well, actually, Your Honor, I think we would then truly be in a burked decision analysis. The employee has been told one thing and has received something very different. There's been a disagreement. They just didn't understand what they said. No arbitration. For better or for worse, the Ninth Circuit recognizes benefits by estoppel. And if the plan made a mistake, then the employee wouldn't have to arbitrate. The employee is automatically entitled to it. And at the end of the day, it shouldn't make a difference because they have a speedier remedy with respect to the grievance than they do with respect to arbitration, Your Honor. I think it's kind of a normal pattern to have the retirees not subject to arbitration clauses because usually they don't have any rights in the union and can't get the union on their side. But something's different here. I mean, it seems to me that this union has decided that it has the obligation to represent these retirees. So I'm just wondering what structurally is different here. If I may go beyond the record, Your Honor. Probably not. Probably not. But my guess is the union wants to establish this principle now with respect to current bargaining unit employees. Okay. And let me just take a brief moment to discuss. And it is peculiar because also it's really a debate at the end of the day about which burden of proof will lie in the event that you end up in court someday. Because, again, we're talking about two alternative dispute resolution methodologies here. With respect to whether or not the number of years of continuous service is an arbitrable issue, let me just say that you don't have to drill down to figure out whether or not that's an issue in this case. You don't have to look at the plan, the PDBA, or the SPD. And the reason is Mr. Bonds testified under oath unequivocally that this issue is not a dispute as to years of continuous service. In requests for admissions, the union admitted this is not a dispute about the number of years of continuous service. In his correspondence to the plan, opposing counsel notified the number of years of continuous service. It was an attempt to determine the years of continuous service. Well, that's a mathematical calculation. And you look at somebody's employment history and make that calculation. Years of service. Right. But this isn't about years of service. This is a plan interpretation issue which is reserved under section 11.3 of the plan to the plan. The plan interpretation question is does this extremely expensive 70-80 benefit get counted at the commencement of layoff or is there some creep component? Now employee A or employee B isn't going to But you only determine the creep component after you've determined the years of service for the people. It's not done in the abstract. That's absolutely correct, Your Honor. And there is no disagreement whatsoever as to the number of years of continuous service as to each of these individuals. That is admitted by the union time and time again. But years of continuous service is a term of art. It includes other things other than the actual time you were there doing your job. That's why it's they're arguing about what will be, quote, continuous service. Well, if there's no question as to the number of years of continuous service and there is instead a question of plan interpretation as to the term at commencement of layoff, which is the trigger, those are two different things. One is covered by arbitration. One is covered by the plan's absolute or reasonable discretion under section 11.3 of the plan. If there are no further questions, I'll keep my remaining time for rebuttal. All right. Thank you, counsel. Thank you. Good morning, Your Honors. I'm Josh Young from Gilbert and Sackman. I'm an attorney for the plaintiffs in this case. It's important not to lose sight of what this case is really about. And the question in this case is about just one thing. Are the plaintiffs entitled to arbitrate their dispute over their age and the number of years of their continuous service? Well, I thought opposing counsel just said that you had conceded that it was not about years of service. I don't think so. What he said was that I think he took the deposition of Terry Bonds, who's the district director of the Steelworkers District 12. And he's not capable of rendering a legal conclusion on what the case is actually about. We've said all along that this case has been about whether or not it's about years of continuous service and age. And any question, as I think you discussed with counsel, is continuous service is a term of art. And it refers to the service you had, how long you were laid off, whether or not you came back. It's not just a technical calculation about... When you started and when you quit. When you started and when you quit. It involves many other factors. And all we want here is for the court to look at the very plain language of the both agreements and say, this is about continuous service and age and put us into arbitration, which is where we wanted to be all along. And nothing else is relevant in this case. They're raising a lot of objections about everything from a presumption of arbitrability to whether or not retirees are covered. But really, this case is about interpreting the very plain and simple language of the contract. But don't we also have to decide whether the retirees are within the class who's entitled to ask for arbitration? Yes, we do. That's, I mean, because that's in the PDBA and the SPD. And I think my opponent said briefly that we were relying on Burke to make a distinction between the PDBA and the SPD there. We aren't. We interpret both of those documents as covering our, and we're not actually talking about retirees here. We're talking about people who want to become retirees. Most of the employees that we're representing are not currently receiving benefits. So they're properly classified as former employees or terminated employees, not retirees yet. We want to get there. Do you you talked about this very clear language. Maybe I've missed something. It strikes me that there's a lot of ambiguity between the SPD and the plan and the PDBA. Do you say that they're all consistent? Well, it depends on what part you're looking at. They're consistent in some ways and not consistent in others. I think with respect to the relevant issues in this case, they are consistent. With the question of arbitrability, the area they're not consistent in is that at commencement of layoff section. Well, I'm not saying that that's how the case comes out, because the Supreme Court is kind of focused on this positive assurance we have to find. So if it's ambiguous, you're still not out of court by a long shot. But I didn't get the feeling that was I read those three, that it was necessarily clear to me on how this case would come out that all three of them, the language was appropriate. So why don't you tell me, tell us, if you wouldn't mind, specifically how is it clear to you that these retirees have a right to arbitrate? Sure. Well, covering, going point by point, and I'm looking here at the section of the PDBA and the SPD that talks about our right to arbitrate, which is section D of the appeals procedure. And that procedure under the SPD says it applies to bargaining unit employees. Under the PDBA it says it applies to employees as defined in the plans. We think those are actually consistent. I don't think that there's a genuine dispute over whether or not our employees who were bargaining unit employees, each and every single one of them, are now exempt from or not able to invoke that provision because they were laid off by a SARCO. I don't think that that comports with any decision that I've found about whether or not a union or employees can take advantage of contract provisions. And let me remind you that the PDBA, even though it's a plan document, is also a collective bargaining agreement. It's also an agreement between the union and the company. And that's why we have an LMRA claim. It's because that's not just one thing, it's another. So regarding that provision about bargaining unit employees, I think they are consistent. I don't think that either one denies terminated employees from invoking that procedure. If you find that they are inconsistent, I think that we're still entitled to invoke the procedure because under the PDBA, which says that it applies to employees as defined in the plans, employees include terminated employees and pensioners. In the master plan document, it says that pensioners are employees who have retired. And employees is a defined term there again. And it says that terminated employees are employees, capital E, that have been terminated. And I think it's very simple that both of those classes of employees are also employees. Continuing down that section, it also says it's not inconsistent regarding the actual number of years of continuous service or the age of the employees. And then it goes on actually the SPD is slightly more favorable to us here, I think, because it says that the appeals procedure is the exclusive remedy for the determination of any dispute concerning number of years of service and age. And that recourse to the other procedure, the claims procedure, is only available where the dispute does not involve those two questions. So I think we really need to focus in on that as the main issue in this case is whether or not our dispute involves continuous service and age. I think that that's the only sort of the central question. I don't see any inconsistency there, to answer your question, between the plan documents. What's the sense behind carving those things out if they're not just ministerial, if they're as broad as you say they are? The answer to that is I don't know. I would be speculating if I was to look behind the continuous service and age. My speculation is that I think that that's probably what they could get, and they assume that that would cover most of the disputes. The union's purpose here is to get these claims into arbitration. That's what we do. So I don't know what the purpose is, but I don't think it can be confined just to a technical dispute versus an interpretive dispute. I don't see that distinction anywhere in any of the plan documents. Counsel, could we talk briefly about the attorney fee award?  On appeal, ASACO is saying that because, let's see, it's saying that the district court should not have awarded ASACO to pay fees because of the bankruptcy. Right. We have an argument in our briefs about that, and it involves that Iona Sphere case in Section 111.3. And I think counsel is right that the district court pointed us to bringing a motion in the bankruptcy court if we wanted to resolve that dispute, and we haven't done that yet. And that's something we were waiting for this decision, to see whether or not we would actually get attorney's fees and be able to bring them against ASACO. Is that a violation of the automatic stay for you even to pursue attorney fees against ASACO? It's a violation if it, well, it's a circular conclusion, because it's a violation if it's a violation. I don't think it's a violation. Did you seek permission from the bankruptcy court before requesting attorney's fees to be awarded against ASACO? We have not been for the bankruptcy. Well, then wouldn't that be a violation of the bankruptcy? I don't think so, because I think those cases make clear that while ASACO is still bound by the collective bargaining agreement, our request isn't subject to the automatic stay. I think that's in our briefs. So this is an 1113 argument? Right. And what about the argument that the fee award should have been limited to the amount that was actually billed to the clients as opposed to the mode star? Oh, I think that's been pretty roundly rejected by this circuit. In fact, there's a new case that came out that I didn't anticipate this being an issue, but the Welch case, it's a Ninth Circuit case that came out a few months ago, that says very specifically that attorney's fees are not actually the amount charged to the client. It's determined by the other fees charged by attorneys of similar skill and competence. And I can get you the site on that if you'd like. I have it. Okay. What about the fact that the time entries didn't comply with the local rule? There was a lot of block billing in that fee request. The Welch case also deals with block billing. And this Court, I think, is bound to give discretion or a great deal of latitude to the district court in determining what is and what is not a reasonable fee award. And I think as that case makes clear and as the district court did here, the district court determined that our block billing did not produce unreasonable fees in this case, that those fees were still reasonable despite that technical violation of the district court's rules. But how can we review it if we don't know what amount of time was spent on each task? Well, I think you can defer to the district court in determining that the fees we spent was reasonable. When the district court reviewed the records, it found that despite the block billing, it was reasonable. How would it know that the time was reasonable if it couldn't determine how much you spent on each task? You can still determine. I mean, to give an example, if there's an e-mail and a letter in a 30-minute increment of time, you can still determine that that is reasonable even though it's block billed. If you're meeting with co-counsel, a telephone conference, research, if you have all of that in one line item, how can we segment that out? I don't think you can segment it out. I don't think in order to determine that it's reasonable that you need to be able to segment that out. What case are you relying upon to support that argument that in determining the reasonableness of attorney's fees, you're not required to be able to link a task to a time period? I don't think there is a case. And if there is, I haven't found it. But I think that the whole point here, the whole purpose of the district court's analysis of the attorney's fee award is whether or not it's reasonable. And the district court found here that it was, despite or with the exception of a couple of things that they deducted. Is that the practice of your firm to do block billing? It is, which we should probably change. But under the Welch case, it's not. What language in the Welch case are you relying upon to say that block billing is okay? The Welch case doesn't say that block billing is okay, but it says that we defer to the district court's decision to whether or not, about whether or not it's reasonable. Well, it says the district court imposed an across-the-board reduction of 20 percent because the firm chose to block bill. Right. I don't think that this case is a mandate that all block billing fees should be automatically reduced. This case is affirming a district court award that in this case determined that those fees were not reasonable. But I don't think it's an absolute prohibition against block billing. I don't think it should be read that way. But it says block billing makes it more difficult to determine how much time was spent on particular activities. Right. Making it impossible to evaluate reasonableness. That's the problem I have with block billing. I don't know how you determine reasonableness if you have block billing. I really think it depends on the specifics of the block and the billing. I think in this case the court found it wasn't reasonable, and in our case it found it was. And I don't find that that's necessarily inconsistent. How do we review it, though? Do we just rubber stamp what the district court has said? No. You should grant them deference, but you should look at it, I think. It makes it difficult, at least for me as a reviewing judge. Can I ask you something about ionosphere? It seems to me that in order to allow the even beyond, you have to go beyond ionosphere. I mean, as I understood ionosphere, the automatic state doesn't stop the arbitration. But the ionosphere court thinks it stops motions to compel, proceedings to compel arbitration. It doesn't stop the arbitration itself. So you want an understanding of 1113 that goes even beyond ionosphere in order to keep your attorney's fee petition going. I don't think so. I think that ionosphere says that unless they reject the collective bargaining agreement, that they're still bound by it and obligated to both arbitrate under it, and that it's not a violation of the automatic stay. I don't think that that 1113 is fair. I was thinking, I thought there was a difference. There was the, there was, you know, Judge Minor dissented in ionosphere. He thought, he took a broader view of 1113 than the majority did. I really have a hard time fitting your attorney's fee position into 113. Yeah, just to follow up on that, I think it's right that they still have to comply with all of the terms of the collective bargaining agreement. But pursuing attorney's fees is different than that. That's seeking relief separate and apart from the collective bargaining agreement against a bankrupt party. It's something we should go before the district court judge in the bankruptcy case and have determined, I think. I think you have to get that stay lifted before you can do anything. I mean, I don't know. But I just, I'm not sure about that. I mean, because that's, yeah, that's not against the plan. It's against ASARCO. Right. Well, it's against both. I mean, we want attorney's fees. I know maybe against both, but it's going to operate against them. Right. You know. We also don't necessarily think we have to. I mean, as we've, I think you're well aware, we, our position is that we don't have to have the plan involved in order to get attorney's fees against. You don't have to do what? I'm sorry, ASARCO, the company. That's what I meant. Right. That's what I meant. Right. Right. Right. That ASARCO is not a necessary party to the case. ASARCO, the company. Well, there's an issue about that, too. There is. Opposing counsel is saying you took the contrary position and said that they were a necessary party below, and now you're saying they're not a necessary party when it comes to the attorney fee issue. If you look at our argument, we covered this in the briefs, our argument was not that they were a necessary party, but rather that they were a proper party. And that's, I think we unfortunately used the term necessarily included, but that was not the thrust of our argument. I think that's how the district court analyzed it. Why did you want ASARCO in if it were not a necessary party? In the initial case? Right. I think it was our sense that they were a proper party, and we wanted them in for that reason. I mean, just because they're not a necessary party doesn't mean they're not a valid defendant, and our purpose was to get the right defendants in the case. So somebody could later on say I'm the wrong person. Right. Okay. Start pointing fingers or whatever. Right. Okay. Anything else? I just want to ask one more question. On the attorney's fees issue, you say that itself can proceed both against the plan and against ASARCO. If we decided it could only proceed against the plan, then where are you? I think that's fine, and the attorney's fees award should then, if you decide that, should go just against the plan. Any relief you want versus ASARCO itself, you have to go to the bankruptcy court. We would be happy to do that. All right. I just want to see if we're all on the same page. I think I'm about to find out that we're not. When the opposing side comes back. Can you just go through, like, one of your billing slip listings, like ER 22, for instance, and just explain to me, you know, so I understand how this billing works. Let's just look at 1216. Okay. Are you Gilbert and Staton? Yeah. Okay. I'm listed here as JFY, if you want to. Is that your firm? Yes, that is my firm. So we're on page 22, right? Let's look at 1216-2003. It says review and revised draft complaint, conference with ASARCO and PINCIA. I don't know what that. Pensioner? I think that's the client there. Okay. It's running over. So that's three different things, and the RJS, I guess, is the attorney who made this notation, right? Actually, no. It says review and revised draft complaint, conference with RJS. So this was JES. Why does it say conference with ASARCO? It's just running over into that line. If you look, all of the slips there contain a notation of ASARCO. And what tasks are included in that block? That would be reviewing and revising a draft complaint and a conference with RJS. And so ASARCO is the case, right? Right. All right. So then it says units. What does that mean? Sorry, I'm not following where you were. Units? Going across. Oh. Is user, units. What's units mean? Units is a segment of an hour. So in this case, it says .5. That would be half an hour. Okay. And then the next is the hourly rate, I'm guessing, right? Correct. And then the slip value, you just multiply the hourly rate times the time. Correct. Okay. All right. I just wanted to make sure I was reading this correct. All right. Thank you. Thank you, Your Honor. I place the Court two very brief points, obviously. The first point is that it is the most basic principle under the National Labor Relations Act that an employee is only part of the collective bargaining unit while that person is an employee. That's why the Eighth Circuit issued its opinion in the Anderson case, which we rely on quite heavily in both of our briefs, where the Court held that retirees must be definitionally different from employees for the purposes of arbitration under a collective bargaining unit. But the company defines employee for purposes of the plan. It does. And it defines employee differently from how it defines a pensioner or a terminated employee. Doesn't Anderson – Anderson speaks to a very difficult problem. The company is gone. The union is gone. There's no one around. Whether that's right or wrong is far different from this case. Isn't this closer to the Third Circuit's Canron case? I would respectfully disagree, Your Honor. In fact, we have most of – You disagree that it's closer? I think it's much closer to the Anderson case in that the El Paso plant was shut down. The employer, therefore, is all but gone. For these individuals, totally gone. It is the same difficult situation. The union is still there. Well, the union is still dealing with the employer in other places, and that's why the union continues to address this issue. So that makes a difference from Anderson. But the company is in bankruptcy. It's shut down, but it still exists. In Anderson, it was gone to the wind. I think that's correct, Your Honor. You know, I think he made too much of his point, but you made too much of yours. If an employee gets fired and he's represented by the union and the union decides that he was improperly fired, in essence wants to bring him back, the union is representing that person as part of the bargaining unit. In that situation, just because he's been, from the company's point of view, not an employee, he's still a member of that bargaining unit. Well, his interest still belongs to the bargaining unit. But, for example, in this case, the union couldn't strike over how we treated retirees because they're not members of the bargaining unit. The union could strike with respect to how we treat current employees on a going-forward basis with respect to this benefit. That's the critical distinction. And that's why you're talking about a retirement benefit and the retiree's limited rights on the one hand and employees' current rights on the other hand. Counsel, did you plan to address the attorney fee appeal at all? I certainly did, but I obviously ran out of time to certainly address Judge Rustani's position or question with respect to what happens if we all agree that ASARCO is in bankruptcy and Section 1113 doesn't apply, which it does not. The trial court failed to apportion fees between the plan and ASARCO. So there would have to be, assuming that we fail with respect to the merits, there would have to be a remand so the trial court could apportion fees between the plan and ASARCO. I'm not sure how the trial court could possibly do that because of the block billing issue. I read Welch, skimmed Welch when it came out. I don't see anything in that opinion that allows anybody to block bill. I know my clients wouldn't allow me to block bill as much as I would like to. The bottom line is Section 1113 and 1114, the bankruptcy code, do not go as far as the union claims. Because of that, this proceeding is stayed as ASARCO Inc. and ASARCO LLC. There can be no fee award without getting some form of stay relief, but then you'd have to go back to square one to figure out who's responsible for which fees. All right. Thank you, counsel. Thank you. Thank you to both counsel. The case just argued is submitted for decision by the court.
judges: Beezer, Fernandez, McKeown